## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

|  |  |  |
|---|---|---|
| DANE HARREL, an individual and resident of St. Clair County, Illinois; | : | |
| | : | |
| C4 GUN STORE, LLC, an Illinois limited liability company; | : | |
| | : | |
| MARENGO GUNS, INC., an Illinois corporation; | : | |
| ILLINOIS STATE RIFLE ASSOCIATION; | : | |
| FIREARMS POLICY COALITION, INC.; *and* | : | |
| SECOND AMENDMENT FOUNDATION, | : | |
| *Plaintiffs*, | : | Case No. 3:23 CV 141-SPM |
| | : | |
| v. | : | |
| | : | |
| KWAME RAOUL, in his official capacity as Attorney General of Illinois; | : | |
| | : | |
| BRENDAN F. KELLY, in his official capacity as Director of the Illinois State Police; | : | **PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
| JAMES GOMRIC, in his official capacity as State's Attorney of St. Clair County, Illinois; | : | |
| | : | |
| JEREMY WALKER, in his official capacity as State's Attorney of Randolph County, Illinois; | : | |
| | : | |
| PATRICK D. KENNEALLY, in his official capacity as State's Attorney of McHenry County, Illinois; | : | |
| | : | |
| RICHARD WATSON, in his official capacity as Sheriff of St. Clair County, Illinois; | : | |
| | : | |
| JARROD PETERS, in his official capacity as Sheriff of Randolph County, Illinois; | : | |
| | : | |
| ROBB TADELMAN, in his official capacity as Sheriff of McHenry County, Illinois; | : | |
| | : | |
| *Defendants*. | : | |
| | : | |

## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

## INTRODUCTION

In In *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), the Supreme Court explained that the Second Amendment "elevates above all other interests the right of law-abiding, responsible citizens to use arms for self-defense" and that it is not legislation, but "the traditions of the American people—that demands our unqualified deference." *Id.* at 2131 (quotation omitted). In this case, Illinois has passed a new law that is irreconcilable with the traditions of the American people. The law, which bans common firearms and ammunition magazines, is unconstitutional and its enforcement be enjoined.

The Supreme Court has now repeatedly said that the Second Amendment "protects the possession and use of weapons that are in common use at the time." *Bruen*, 142 S. Ct. at 2128 (quotation omitted). The firearms and magazines Illinois recently banned certainly qualify for protection under this standard. The firearms include many of the most commonly owned firearms in the country and the magazines are integral for the operation of common firearms. There are tens of millions of banned firearms and hundreds of millions of banned magazines in circulation in the United States today. As such, there is no possible justification for Illinois' unconstitutional ban. And because the law Plaintiffs challenge is unconstitutional, they are entitled to a preliminary injunction to stop it from remaining in effect. Not only are they likely to succeed on the merits, but the constitutional violation of restricting Plaintiffs' freedom to use their existing firearms and magazines for self-defense, to acquire new firearms and magazines, and to supply their customers with additional firearms magazines, ~~would be~~ is irreparable, and public interest always favors the injunction of unconstitutional laws. Because this case involves purely legal issues and no fact development is necessary, Plaintiffs furthermore request that the Court advance the trial on the

merits and consolidate it with the preliminary injunction hearing, or alternatively, construe their motion as one for summary judgment. *See* Fed R. Civ. P. 65(a)(2).

## BACKGROUND

### I.   The Illinois Firearm Ban

On January 10, 2023, Illinois enacted sweeping gun control legislation. The new law, which took effect immediately, makes it unlawful to "manufacture, deliver, sell, import, [] purchase," or "possess" any so-called "assault weapon." 720 ILCS 5/24-1.9(b) & (c). Although it exempts law enforcement, military, and private security contractors, it effectively functions as a flat ban applicable to "any person within [Illinois]." 720 ILCS 5/24-1.9(b), (c), & (e)(1)–(7). Even firearms that are already owned are strictly curtailed by the law, which requires owners to register them in order to comply with the law and permits possession of registered firearms in a very limited set of locations. 720 ILCS 5/24-1.9(d).

Section 24-1.9 ("the Firearm Ban") defines as "assault weapons" scores of common semiautomatic rifles, either by name or by feature. A rifle is banned if it has the capacity to accept a magazine holding more than ten rounds of ammunition and it has one of the following features:

> (i) a pistol grip or thumbhole stock;
> (ii) any feature capable of functioning as a protruding grip that can be held by the non-trigger hand;
> (iii) a folding, telescoping, thumbhole, or detachable stock, or a stock that is otherwise foldable or adjustable in a manner that operates to reduce the length, size, or any other dimension, or otherwise enhances the concealability of, the weapon;
> (iv) a flash suppressor;
> (v) a grenade launcher;
> (vi) a shroud attached to the barrel or that partially or completely encircles the barrel, allowing the bearer to hold the firearm with the non-trigger hand without being burned, but excluding a slide that encloses the barrel.

720 ILCS 5/24-1.9(a)(1)(A). Additionally, the Firearm Ban applies to "any part or combination of parts designed or intended to convert a firearm into an assault weapon, including any combination

3

of parts from which an assault weapon may be readily assembled if those parts are in the possession or under the control of the same person." 720 ILCS 5/24-1.9(a)(1)(I). And the Firearm Ban also lists specific models of firearms which are banned, along with their "copies, duplicates, variants, [and] altered facsimiles," a list which notably includes "all AK types" as well as "all AR types," the latter of which includes the overwhelmingly popular AR-15 and related models of rifle. 720 ILCS 5/24-1.9(a)(1)(J).

## II.     The Illinois Magazine Ban

In addition to the Firearm Ban, the law enacted on January 10, 2023 contained a separate ban on certain ammunition magazines the state has dubbed "large capacity" ("the Magazine Ban"). The new law makes it a crime to "manufacture, deliver, sell, purchase," or "possess" such magazines, which includes any "magazine belt drum, feed strip, or similar device that has a capacity of, or can be readily restored or converted to accept, more than 10 rounds of ammunition for long guns and more than 15 rounds of ammunition for handguns" as well as the parts to assemble such an ammunition feeding device. 720 ILCS 5/24-1.10(a)(1)–(2), (b) & (c). As with the Firearm Ban, the Magazine Ban applies to "any person within [the State]" and exempts only law enforcement, military and some private security contractors. 720 ILCS 5/24-1.10(b), (c), & (e)(1)–(7). And also like the Firearm Ban, existing magazines above the 10- or 15-round limit may only be possessed by their current owners in a limited set of locations. 720 ILCS 5/24-1.10(d).

## III.    The Plaintiffs are harmed by the Firearm and Magazine Bans.

Plaintiffs in this case are one individual, two licensed firearm dealers, and three organizations, who bring this action to prevent the irreparable harm that will result from the Firearm and Magazine Bans being enforced against them. Plaintiff Dane Harrel is a law-abiding Illinois citizen and member of Plaintiffs Illinois State Rifle Association ("ISRA"), Firearms Policy Coalition, Inc ("FPC"), and Second Amendment Foundation ("SAF") (collectively,

4

"Organizational Plaintiffs"). Decl. of Dane Harrel in Supp. of Pls.' Mot. for a Prelim. Inj. ¶3 (January 24, 2023). He owns semiautomatic firearms and magazines that are subject to the challenged Bans and since the Bans have gone into effect he has been subject to the use restrictions and registration requirement associated with the Bans. *Id.* at ¶4. If it were not for the Bans, he would acquire additional noncompliant magazines as necessary as well as additional semiautomatic firearms that are now banned, including a Ruger Mini-14 and a Springfield Armory M1A. *Id.* at ¶5. However, because he fears arrest, criminal charges, prosecution, fines and/or incarceration by Defendants under the challenged laws, and because the Bans have destroyed the legal market for such magazines and firearms in Illinois, he cannot exercise his Second Amendment rights by purchasing and using these commonly possessed firearms and magazines. *Id.* at ¶6.

Plaintiffs C4 Gun Store, LLC and Marengo Guns, Inc. are both federally licensed firearm dealers and their principals are members of the Organizational Plaintiffs. Decl. of Christopher A. Brooks in Supp. of Pls.' Mot for a Prelim. Inj. ¶¶3-4 (January 24, 2023) ("Brooks Decl."); Decl. of Dominic DeBock in Supp. of Pls.' Mot. for a Prelim. Inj. ¶¶3-4 (January 24, 2023) ("DeBock Decl."). Until the Bans went into effect, they both sold noncompliant magazines and banned firearms, but because of the Bans, they have been forced to cease such sales almost entirely. Brooks Decl. ¶5; DeBock Decl. ¶5.

The Organizational Plaintiffs are nonprofit organizations that seek to promote the Second Amendment rights of their members. Decl. of Richard Pearson in Supp. of Pls.' Mot. for a Prelim. Inj. ¶2 (January 24, 2023) ("Pearson Decl."); Decl. of Brandon Combs in Supp. of Pls.' Mot. for a Prelim. Inj. ¶2, (January 24, 2023) ("Combs Decl."); Decl. of Alan Gottlieb in Supp. of Pls.' Mot. for a Prelim. Inj. ¶2, (January 25, 2023) ("Gottlieb Decl."). They each have members in Illinois,

including the named Plaintiffs, and bring this action to vindicate the rights of their members. Pearson Decl. ¶3; Combs Decl. ¶3; Gottlieb Decl. ¶3. However, because their members fear arrest, prosecution, fine and incarceration by Defendants under the challenged laws, and because the Bans have destroyed the legal market for such magazines and firearms in Illinois, their members cannot exercise their Second Amendment rights by purchasing and using these commonly possessed firearms and magazines. Pearson Decl. ¶¶4-5; Combs Decl. ¶¶4-5; Gottlieb Decl. ¶¶4-5.

The Defendants are Illinois officials with authority to enforce the Bans against Plaintiffs. Defendant Kwame Raoul, as Illinois Attorney General, is responsible for enforcing the State's laws and has concurrent authority with the state's attorneys to initiate prosecutions on behalf of the People of Illinois, including prosecutions for violations of the Bans. *See People v. Buffalo Confectionary Co.*, 401 N.E.2d 546, 549 (Ill. 1980). Defendant Brendan F. Kelly is responsible for managing and controlling enforcement of the State's criminal laws by the State Police, including the Bans, *see* 20 ILCS 2610/2, 2610/16. The remaining defendants are the county sheriffs and state's attorneys for the counties where the Individual Plaintiffs reside who have authority to enforce the Bans against the Plaintiffs. 55 ILCS 5/3-9005; *Gibbs v. Madison Cnty. Sheriff's Dep't*, 326 Ill. App. 3d 473, 478 (2001).

## ARGUMENT

"To win a preliminary injunction, a party must show that it has (1) no adequate remedy at law and will suffer irreparable harm if a preliminary injunction is denied and (2) some likelihood of success on the merits. If the moving party meets these threshold requirements, the district court weighs the factors against one another, assessing whether the balance of harms favors the moving party or whether the harm to the nonmoving party  or the public is sufficiently weighty that the

injunction should be denied." *Ezell v. City of Chicago*, 651 F.3d 684, 694 (7th Cir. 2011) (citations omitted).

I.   **Plaintiffs are likely to succeed on the merits because the Firearm Ban is unconstitutional under *Bruen*.**

In *Bruen*, the Supreme Court held that "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government . . . must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." 142 S. Ct. at 2126. Here, the Second Amendment's plain text covers the firearms Illinois bans, so it falls to Defendants to justify the ban as consistent with historical tradition rooted in the Founding. They cannot possibly do so, because *Bruen* has already established that there is no tradition of banning commonly possessed arms.

A.  **The banned firearms are arms within the meaning of the Second Amendment.**

The Second Amendment states: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II. The challenged laws ban semiautomatic rifles based on certain features—for example, a rifle is banned if it can accept a detachable magazine and has a muzzle brake or muzzle compensator—or based on a rifle's inclusion in a list of specific models of banned arms. These are "Arms" within the meaning of the Second Amendment's plain text, which presumptively protects Americans' rights to possess "all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *District of Columbia v. Heller*, 554 U.S. 570, 582 (2008); *accord Caetano v. Massachusetts*, 577 U.S. 411, 411 (2016); see also *Bruen*, 142 S. Ct. at 2132. As a result, under *Bruen* the burden shifts to the Defendants to show that the Firearm Ban is consistent with this Nation's tradition of firearm regulation.

7

### B.  The Firearm Ban cannot be historically justified.

#### 1.  Only "dangerous and unusual" arms can be banned consistent with our country's history.

If the Ban is to survive, Illinois must prove that it is "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126. Both *Bruen* and *Heller* have already established the relevant contours of the tradition at issue in this case: bearable arms cannot be banned unless doing so would fit into the "historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.' " *Id.* at 2128 (quoting *Heller*, 554 U.S. at 627). And a law by definition *will not* fit into that tradition if it bans "possession and use of weapons that are 'in common use at the time.' " *Id.* at 2128 (quoting *Heller*, 554 U.S. at 627; *see also id*. at 625.

This test is based on historical practice and "the historical understanding of the scope of the right." *Heller*, 554 U.S. at 625; *see also Bruen*, 142 S. Ct. at 2131 ("The test that we set forth in *Heller* and apply today requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding."); *Rocky Mountain Gun Owners v. Town of Superior, Colo.*, No. 1:22-cv-01685, Doc. 18 at 9–10 (D. Col. July 22, 2022) (granting, post-*Bruen*, a temporary restraining order against enforcement of a ban on certain semiautomatic rifles and noting "the Court is unaware of historical precedent that would permit a governmental entity to entirely ban a type of weapon that is commonly used by law-abiding citizens for lawful purposes"). In the context of bans on bearable arms, in other words, *the Supreme Court has already done the historical spadework*—and the only restrictions of this kind that it has deemed consistent with the historical understanding of the right to keep and bear arms are restrictions limited to *dangerous and unusual* arms that *are not in common use*.

This Court's task is therefore a simple one: it must merely determine whether the banned firearms are "dangerous and unusual." "[T]his is a conjunctive test: A weapon may not be banned

unless it is *both* dangerous *and* unusual." *Caetano*, 577 U.S. at 417 (Alito, J., concurring). Thus, a firearm that is in common use for lawful purposes, by definition, *does not* fall within this category and *cannot be banned*. *Bruen*, 142 S. Ct. at 2143.

To determine whether a firearm is "unusual" the Supreme Court has likewise made clear that the Second Amendment focuses on the practices of the American people *nationwide*, not just in Illinois. *See id.* at 2131 ("It is this balance—struck by the traditions *of the American people*— that demands our unqualified deference." (emphasis added)); *Heller*, 554 U.S. at 628 (handguns are "overwhelmingly chosen by *American society*" for self-defense (emphasis added)); *Caetano*, 577 U.S. at 420 (Alito, J., concurring) ("stun guns are widely owned and accepted as a legitimate means of self-defense *across the country*" (emphasis added)). Therefore, the Amendment protects those who live in states or localities with a less robust practice of protecting the right to keep and bear firearms from outlier legislation (like Illinois' ban here) just as much as it protects those who live in jurisdictions that have hewed more closely to America's traditions.

Furthermore, courts and legislatures do not have the authority to second-guess the choices made by law-abiding citizens by questioning whether they really "need" the arms that ordinary citizens have chosen to possess. While *Heller* noted several "reasons that a citizen may prefer a handgun for home defense," the Court held that "[w]*hatever the reason*, handguns are the most popular weapon chosen by Americans for self-defense in the home, and a complete prohibition of their use is invalid." 554 U.S. at 629 (emphasis added). And in *Bruen* the Court reaffirmed that "the traditions of the American people"—which includes their choice of preferred firearms— "demand[ ] [the courts'] unqualified deference." 142 S. Ct. at 2131. Thus, unless the State can show that a certain type of firearm is "not typically possessed by law-abiding citizens for lawful

purposes," *Heller*, 554 U.S. at 625, that is the end of the matter. Firearms owned by law-abiding citizens for lawful purposes cannot be banned.

Finally, the Second Amendment inquiry focuses on the choices commonly made by *contemporary* law-abiding citizens. *Heller* rejected as "bordering on the frivolous" "the argument . . . that only those arms in existence in the 18th century are protected," *id*. at 582. And in *Caetano*, the Supreme Court reiterated this point, holding that "Arms" protected by the Second Amendment need not have been "in existence at the time of the Founding." 577 U.S. 411–12 (quoting *Heller*, 554 U.S. at 582). The *Caetano* Court flatly denied that a particular type of firearm's being "a thoroughly modern invention" is relevant to determining whether the Second Amendment protects it. *Id*. And *Bruen* cements the point. Responding to laws that allegedly restricted the carrying of handguns during the colonial period, the Court reasoned that "even if these colonial laws prohibited the carrying of handguns because they were considered 'dangerous and unusual weapons' in the 1690s, they provide no justification for laws restricting the public carry of weapons that are unquestionably in common use today." *Bruen*, 142 S. Ct. at 2143.

### 2. The banned firearms are in common use.

This case thus reduces to the following straightforward inquiry: are the arms banned by Illinois in "common use," according to the lawful choices by contemporary Americans? They unquestionably are.

The term "assault weapons" is a misnomer. "Prior to 1989, the term 'assault weapon' did not exist in the lexicon of firearms. It is a political term, developed by anti-gun publicists . . ." *Stenberg v. Carhart*, 530 U.S. 914, 1001 n.16 (2000) (Thomas, J., dissenting). But while "assault weapons" are not a recognized category of firearms, "semiautomatic" is. And it is semiautomatic rifles that Illinois labels as "assault weapons" and which Plaintiffs wish to acquire. The "automatic" part of "semiautomatic" refers to the fact that the user need not manually load another

round in the chamber after each round is fired. But unlike an automatic rifle, a semiautomatic rifle will not fire continuously on one pull of its trigger; rather, a semiautomatic rifle requires the user to pull the trigger each time he or she wants to discharge a round. *See Staples v. United States*, 511 U.S. 600, 602 n.1 (1994).

Even accepting Illinois' framing, if the banned firearms *are* considered as a separate category of arms rather than simply examples of semiautomatic firearms, they still easily satisfy the common use test. The dispositive point under *Heller* and *Bruen* is that millions of law-abiding citizens choose to possess firearms in that category. "Commonality is determined largely by statistics." *Duncan v. Becerra*, 970 F.3d 1133, 1147 (9th Cir. 2020), *rev'd* 19 F.4th 1087 (9th Cir. 2021) (en banc), *granted, vacated, and remanded in light of Bruen*, 142 S. Ct. 2895 (2022); *see also Ass'n of N.J. Rifle & Pistol Clubs*, *Inc. v. Att'y Gen.* ("*ANJRPC*"), 910 F.3d 106, 116 (3d Cir. 2018), *abrogated by Bruen* (finding an "arm" is commonly owned because "[t]he record shows that millions . . . are owned"); *New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 255 (2d Cir. 2015), *abrogated by Bruen* ("Even accepting the most conservative estimates cited by the parties and by amici, the assault weapons . . . at issue are 'in common use' as that term was used in *Heller*."); *Heller II*, 670 F.3d at 1261 ("We think it clear enough in the record that semi-automatic rifles . . . are indeed in 'common use.' "). This is demonstrated by the AR-15 and other modern semiautomatic rifles, which epitomize the firearms that Illinois bans.

The AR-15 is America's "most popular semi-automatic rifle," *Heller II*, 670 F.3d at 1287 (Kavanaugh, J., dissenting), and in recent years it has been "the best-selling rifle type in the United States," Nicholas J. Johnson, *Supply Restrictions at the Margins of Heller and the Abortion Analogue*, 60 HASTINGS L.J. 1285, 1296 (2009). Today, the number of AR-rifles and other similar rifles in circulation in the United States exceeds **twenty-four million**. *Commonly Owned: NSSF*

11

*Announces Over 24 Million MSRS in Circulation*, NSSF (July 20, 2022), https://bit.ly/3QBXiyv. *See also See* William English, *2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned* at 1 (May 13, 2022), https://bit.ly/3yPfoHw (finding that an estimated 24.6 million American gun owners have owned AR-15s or similar rifles). And in recent years they have been the second-most common type of firearm sold, at approximately 20% of all firearm sales, behind only semiautomatic handguns. *See 2021 Firearms Retailer Survey Report*, NAT'L SHOOTING SPORTS FOUND., INC., 9, *available at* https://bit.ly/3gWhI8E.

AR-style rifles are commonly and overwhelmingly possessed by law-abiding citizens for lawful purposes. In a 2021 survey of 16,708 gun owners, recreational target shooting was the most common reason (cited by 66% of owners) for possessing an AR-style firearm, followed closely by home defense (61.9% of owners) and hunting (50.5% of owners). English, *supra*, at 33–34. This is consistent with the findings of another recent survey of over 2,000 owners of such firearms, in which home-defense again followed (closely) only recreational target shooting as the most important reason for owning these firearms. *See* Modern Sporting Rifle: Comprehensive Consumer Report 5, NAT'L SHOOTING SPORTS FOUND., INC., *available at* https://bit.ly/3SSrVjM. These purposes are plainly lawful (and related), as "maintain[ing] proficiency in firearm use [is] an important corollary to . . . self-defense," *Ezell*, 651 F.3d at 708. Another survey found that more than 20 million adults participated in target or sport shooting with firearms like those Illinois has banned. *Sport Shooting Participation in the U.S. in 2020* iii, NAT'L SHOOTING SPORTS FOUND., INC., *available at* https://bit.ly/3sPuEQl. Overall, "AR-style rifles are popular with civilians and law enforcement around the world because they're accurate, light, portable, and modular. . . . [The AR-style rifle is] also easy to shoot and has little recoil, making it popular with women. The AR-15 is so user-friendly that a group called 'Disabled Americans for Firearms Rights' . . . says the

AR-15 makes it possible for people who can't handle a bolt-action or other rifle type to shoot and protect themselves. FRANK MINITER, THE FUTURE OF THE GUN, 35 (2014).

While banned firearms have been used in rare but high profile crimes, like the mass murder last year in Highland Park, the fact is that AR-15s and other banned rifles are used extremely rarely in crimes of any type, underscoring that they are commonly possessed for lawful purposes. Further, as there is nothing mechanically different about these firearms than other similar semiautomatic firearms, there is no reason to think the few crimes committed with them are made worse due to their use.

Evidence indicates that "well under 1% [of crime guns] are 'assault rifles.' " GARY KLECK, TARGETING GUNS: FIREARMS AND THEIR CONTROL 112 (1997). From 2015 through 2020, only 2.2% of murders were committed with *any* type of rifle. *See Crime Data Explorer*, 2020, FBI, U.S. DEP'T OF JUST., https://bit.ly/3pLXPmd; *Expanded Homicide Data Table 8: Murder Victims by Weapon, 2015–2019*, *Crime in the United States*, 2019, FBI, U.S. DEP'T OF JUST., https://bit.ly/31WmQ1V (90,594 total murders; 2,028 with rifles). Murder by "hands, fists, feet, etc." was almost twice as common, at 4,008, over the same time period—and murder by handgun, at over 40,000, was over *20 times* as common. *Id.* Even in the counterfactual event that a different modern semiautomatic rifle had been involved in each rifle-related murder from 2015 to 2020, an infinitesimal percentage of the approximately 20 million modern sporting rifles in circulation in the United States during that time period—around .01 percent—would have been used for that unlawful purpose. More broadly, as of 2016, only .8 percent of state and federal prisoners reported using *any* kind of rifle during the offense for which they were serving time. Mariel Alper & Lauren Glaze, *Source and Uses of Firearms Involved in Crimes: Survey of Prison Inmates, 2016*, U.S.

DEP'T OF JUST., OFF. OF JUST. PROGS., BUREAU OF JUST. STATS. 5 tbl. 3 (Jan. 2019), https://bit.ly/31VjRa9.

Finally, the Supreme Court's decision in *Caetano* further confirms that the arms banned by Illinois are in common use for lawful purposes. That case concerned Massachusetts's ban on the possession of stun guns, which the Commonwealth's highest court had upheld on the basis that such weapons are not protected by the Second Amendment. 577 U.S. at 411. With a brief *per curiam* opinion, the Supreme Court vacated that decision. *Id.* at 411–12. Though the Court remanded the case back to the state court without deciding whether stun guns are constitutionally protected, *see id.*, Justice Alito filed a concurring opinion concluding that those arms "are widely owned and accepted as a legitimate means of self-defense across the country," based on evidence that "hundreds of thousands of Tasers and stun guns have been sold to private citizens." *Id.* at 420 (Alito, J., concurring) (cleaned up) (citation omitted). Of course, that is far fewer than the millions of semiautomatic rifles sold to private citizens nationwide that Illinois bans.

The Massachusetts Supreme Judicial Court got the message. In a subsequent case, that Court, relying on *Caetano*, held that because "stun guns are 'arms' within the protection of the Second Amendment," the state's law barring "civilians from possessing or carrying stun guns, even in their home, is inconsistent with the Second Amendment and is therefore unconstitutional." *Ramirez v. Commonwealth*, 94 N.E.3d 809, 815 (Mass. 2018). The Illinois Supreme Court followed suit with a similar ruling in 2019, relying on *Caetano* and *Ramirez* to conclude that "[a]ny attempt by the state to rebut the *prima facie* presumption of Second Amendment protection afforded stun guns and tasers on the grounds that the weapons are uncommon or not typically possessed by law-abiding citizens for lawful purposes would be futile." *People v. Webb*, 131 N.E.

14

3d 93, 96 (Ill. 2019). This reasoning is sound, and it necessarily entails the invalidity of Illinois'

ban, which restricts arms that are many times more common than stun guns.

That the banned firearms, as a subset of semiautomatic firearms, are in common use ends

the inquiry. Even so, the Court should not credit any argument that attempts to paint the banned

firearms as different from other semiautomatic rifles. There are significant practical differences

between automatic "machine guns" and semiautomatic rifles. According to the United States

Army, for example, the maximum effective rates of fire for various M4- and M16-series firearms

is between forty-five and sixty-five rounds per minute in semiautomatic mode, versus 150-200

rounds per minute in automatic mode. *Rifle Marksmanship: M16-/M4-Series Weapons*, DEP'T OF

THE ARMY 2-1 tbl. 2-1 (Aug. 2008), https://bit.ly/3pvS3SW. But "AW-type firearms do not operate

differently than other comparable semiautomatics, nor do they fire more lethal ammunition."

Christopher S. Koper, *Assessing the Potential to Reduce Deaths and Injuries from Mass Shootings*

*Through Restrictions on Assault Weapons and Other High-Capacity Semiautomatic Firearms*, 19

CRIM'Y & PUB. POL'Y 147, 149 (2020). Indeed, the AR-15—the paradigmatic semiautomatic rifle

targeted by "assault weapons" laws—is typically chambered for .223in/5.56mm ammunition, *see,*

*e.g.*, *Worman v. Healey*, 293 F. Supp. 3d 251, 258 (D. Mass. 2018), *aff'd* 922 F.3d 26 (1st Cir.

2019), which "makes it safer to use as a home-defense gun because this lighter caliber is less likely

to travel through walls," MINITER, *supra*, at 35. The rifles Illinois bans also fire at the same rate as

all other semiautomatics—one round for each pull of the trigger.

There is a venerable tradition in this country of lawful private ownership of semiautomatic

firearms. The Supreme Court has held as much, concluding in *Staples* that semiautomatics, unlike

machine guns, "traditionally have been widely accepted as lawful possessions." *Staples*, 511 U.S.

at 612. Semiautomatic rifles have been commercially available for over a century. *See Heller v.*

*District of Columbia* ("*Heller II*"), 670 F.3d 1244, 1287 (D.C. Cir. 2011) (Kavanaugh, J.,

dissenting); David B. Kopel, *Rational Basis Analysis of "Assault Weapon" Prohibition*, 20 J.

Contemp. L. 381, 413 (1994). Yet apart from the now-expired ten-year federal "assault weapons"

ban, the Federal Government has not banned them. And currently the vast majority of States do

not ban semiautomatic rifles deemed "assault weapons."[1] They are in common use and the Illinois

Ban, which is an outlier, must be enjoined.

## II.     The Magazine Ban is Unconstitutional Under *Bruen*.

### A.     The Magazine Ban covers conduct protected by the text of the Second Amendment.

As discussed above, the Second Amendment protects the right to "keep and bear Arms"

and "Arms" facially covers "all instruments that constitute bearable arms." *Heller*, 554 U.S. at

582. The Magazine Ban impacts that right no less than the Firearms Ban. Just as the First

Amendment would not allow the government to ban the ink used to print newspapers, the Second

Amendment does not permit it to ban triggers, barrels, magazines, or any other component integral

to an operable firearm. Constitutional rights "implicitly protect those closely related acts necessary

to their exercise." *Luis v. United States*, 578 U.S. 5, 26 (2016) (Thomas, J., concurring in the

judgment). As the Seventh Circuit noted before *Bruen*, "[t]he right to possess firearms for

protection implies a corresponding right to acquire and maintain proficiency in their use; the core

right wouldn't mean much without the training and practice that make it effective." *Ezell*, 651 F.3d

at 704. It would mean even less without the magazines that make it possible to defend oneself with

---

[1] In addition to Illinois, California, Connecticut, Delaware, Maryland, Massachusetts, New Jersey, and New York, as well as the District of Columbia, have enacted bans on rifles deemed "assault weapons," with varying definitions of the prohibited firearms. *See* Cal. Penal Code §§ 30600, 30605; Conn. Gen. Stat. § 53-202c; 11 Del. Code § 1466; Md. Code Ann., Crim. Law §§ 4-301, 4-303; *id.*, Pub. Safety § 5-101(r)(2); Mass. Gen. Laws ch. 140, § 131M; N.J. Stat. §§ 2C:39-5(f), 2C:39-9(g); N.Y. Penal Law §§ 265.02(7), 265.10(1)-(3); D.C. Code Ann. §§ 7-2501.01(3A), 7-2502.02(a)(6), 7-2505.01, 7-2505.02(a), (c).

a semiautomatic firearm. For this reason, the Second Amendment's text covered ammunition magazines on the same footing as firearms themselves. *ANJRPC*, 910 F.3d at 116 ("Because magazines feed ammunition into certain guns, and ammunition is necessary for such a gun to function as intended, magazines are 'arms' within the meaning of the Second Amendment."); *see also Fyock v. Sunnyvale*, 779 F.3d 991, 998 (9th Cir. 2015) ("[O]ur case law supports the conclusion that there must also be some corollary, albeit not unfettered, right to possess the magazines necessary to render those firearms operable."). Looking at it from a different angle, the clear purpose of the Magazine Ban is to functionally ban handguns capable of firing more than fifteen rounds, and rifles capable of firing more than ten, without reloading. Such firearms are *unquestionably* Arms within the meaning of the Second Amendment.

### B. The banned magazines are in common use.

As with the Firearm Ban, the only possible historical justification for Illinois' sweeping magazine ban are the historical laws restricting "dangerous and unusual weapons." But as discussed above, by definition, an arm *cannot* be "dangerous and unusual" if it is "in common use" and "typically possessed by law-abiding citizens for lawful purposes." *Heller*, 554 U.S. at 627, 628. Here, there can be no question about it—handgun magazines holding more than 15 rounds and rifle magazines holding more than 10 rounds are in common use.

Regarding magazines holding over 10 rounds, according to the 2021 National Firearms Survey, 48% of gun owners have owned magazines that hold more than 10 rounds. *Supra* English, at 22. Given the survey's estimate that 81.4 million Americans own firearms, approximately 39 million Americans have owned at least one magazine that holds more than 10 rounds. And that is a conservative estimate since only current gun owners were polled. Those individuals frequently owned more than one such magazine. And even limiting the review to rifle magazines holding more than ten rounds the numbers are staggering: Professor English found American gun owners

17

have owned as many as *273 million* such rifle magazines. *Id.* at 24. There is nothing surprising about that result. Many of the most popular semi-automatic rifles are manufactured with standard magazines holding more than ten rounds. *See, e.g.*, David B. Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 ALB. L. REV. 849, 859 (2015) ("The most popular rifle in American history is the AR-15 platform, a semiautomatic rifle with standard magazines of twenty or thirty rounds."). Indeed, over *three quarters* of modern sporting rifle magazines in the country have a capacity of more than 10 rounds. *See Modern Sporting Rifle Comprehensive Consumer Report*, at 31, NSSF (July 14, 2022), *available at* https://bit.ly/3GLmErS.

Though Illinois draws a different line for handgun magazines, the result is the same. Handgun magazines holding more than 15 rounds are also extremely common. Professor English found that the average owner of *any* magazines over 10 rounds possessed, on average, 4.4 handgun magazines holding more than 15 rounds. English*, supra* at 24. In fact, handgun magazines over 15 rounds were twice as popular as magazines holding 11-15 rounds. As a result, using Professor English's calculations, of the up to 269 million handgun magazines holding more than 10 rounds, as many as 170 million hold over 15 rounds. *Id.*

These magazines are commonly possessed for lawful purposes. According to the National Firearms Survey, the most common reasons cited for owning magazines holding more than ten rounds (including, although it does not break this data out separately, handgun magazines holding more than fifteen rounds) are target shooting (64.3% of owners), home defense (62.4%), hunting (47%), and defense outside the home (41.7%). English, *supra*, at 23. And such magazines may be lawfully owned in the vast majority of states. *See* Lillian Mongeau Hughes, *Oregon Voters Approve Permit-to-Purchase for Guns and Ban High-Capacity Magazines*, NPR (Nov. 15, 2022), https://n.pr/3QMJCC1.

These statistics conclusively demonstrate that these magazines are commonly owned and used overwhelmingly used by law-abiding Americans for lawful purposes. "[C]ourts throughout the country agree that large-capacity magazines are commonly used for lawful purposes." *Duncan*, 19 F.4th at 1155–56 (Bumatay, J., dissenting); *see also Fyock*, 779 F.3d at 998 ("[W]e cannot say that the district court abused its discretion by inferring from the evidence of record that, at a minimum, [large-capacity] magazines are in common use."); *ANJRPC*, 910 F.3d at 116–17 (3d Cir. 2018) ("The record shows that millions of magazines are owned, often come factory standard with semi-automatic weapons, are typically possessed by law-abiding citizens for hunting, pest-control, and occasionally self-defense, and there is no longstanding history of [large capacity magazine] regulation.") (internal citations omitted); *Cuomo*, 804 F.3d at 255 ("Even accepting the most conservative estimates cited by the parties and by amici, the . . . large-capacity magazines at issue are 'in common use' as that term was used in *Heller*."); *Heller II*, 670 F.3d at 1261 (D.C. Cir. 2011) ("There may well be some capacity above which magazines are not in common use but, if so . . . that capacity surely is not ten."). As a result, under *Bruen* and *Heller*, Illinois' magazine ban is unconstitutional and Plaintiffs have demonstrated they are likely to succeed on the merits of their claim.

### III.   *Bruen* abrogated the Seventh Circuit's decisions in *Friedman* and *Wilson*.

Prior to the Supreme Court's decision in *Bruen*, the Seventh Circuit upheld bans similar to those at issue here, but those decisions are no longer good law and do not represent accurate interpretations of the Second Amendment. In *Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015), the Court upheld a municipal ban on so-called "assault weapons" and "large capacity magazines." In doing so, the Court did not apply the text-and-history framework that *Bruen* has clarified is the test, nor did it assess whether the banned firearms were in common use for lawful purposes—which *Bruen* has demonstrated is the historical test for such laws—but rather

the court thought "it better to ask whether a regulation bans weapons that were common at the time of ratification or those that have 'some reasonable relationship to the preservation or efficiency of a well regulated militia,' and whether law-abiding citizens retain adequate means of self-defense." *Id.* at 410. And in *Wilson v. Cook County*, 937 F.3d 1028 (7th Cir. 2019), which involved an effectively identical ban, the Seventh Circuit declined to revisit *Friedman* and found it controlling. Not only is the test under *Friedman* not the test under *Bruen*, these cases are essentially irrelevant to the analysis this Court must do. Whether a type of firearm existed in the 1790s has no bearing on whether it is constitutionally protected; *Bruen* clarified that weapons that are protected are those "in common use *today*." 142 S. Ct. at 2143 (emphasis added). The same is true for whether the banned arms have "some reasonable relationship to the preservation or efficiency of a well regulated militia." *Friedman*, 784 F.3d at 410 (quoting *Heller*, 554 U.S. at 622). In *Bruen*, the Supreme Court analyzed a late-19th-century case, *English v. State*, 35 Tex. 473 (1871), in which the Texas Supreme Court had concluded that the Second Amendment and the state's analogue only protected such arms "as are useful and proper to an armed militia." *Id.* at 474. The *Bruen* Court dismissed this rationale as an "outlier[]," 142 S. Ct. at 2153, and instead reiterated that the Second Amendment right to keep and bear arms "does not depend on service in the militia," *id.* at 2127 (quotation omitted). Instead, as discussed above, the only question in this case is whether the firearms in question are in common use. *Id.* at 2143. Because their rationales are incompatible with *Bruen*, neither *Friedman* nor *Wilson* have any bearing on this case. *See, e.g., Thomas for Brown v. Sullivan*, 785 F. Supp. 788, 791 (C.D. Ill. 1992) (declining to apply Seventh Circuit precedent in light of intervening contrary Supreme Court decision).

## IV.  The other preliminary injunction factors favor Plaintiffs.

Like the First Amendment, "[t]he Second Amendment protects . . . intangible and unquantifiable interests" and infringements of the Second Amendment "right to possess firearms

for protection . . . cannot be compensated by damages." *Ezell*, 651 F.3d at 699. So for the same reasons Plaintiffs have shown they are likely to succeed on the merits of their Second Amendment claim, they have established irreparable harm and have no adequate remedy at law. "The remaining consideration for preliminary injunctive relief is the balance of harms." *Id.* at 710. Again, this factor favors Plaintiffs for the same reasons that the challenged laws are likely unconstitutional under the Second Amendment. The Seventh Circuit has held in the context of the First Amendment that "the balance of harms normally favors granting preliminary injunctive relief because the public interest is not harmed by preliminarily enjoining the enforcement of a statute that is probably unconstitutional." *Higher Soc'y of Indiana v. Tippecanoe Cnty., Indiana*, 858 F.3d 1113, 1116 (7th Cir. 2017). The Second Amendment is not a "second-class right" subject to different rules than the First Amendment, *Bruen*, 142 S. Ct. at 2156 (citation omitted), and in fact both the Supreme Court and the Seventh Circuit have repeatedly likened Second Amendment claims to those under the First Amendment, *Ezell*, 651 F.3d at 710; *Heller*, 554 U.S. at 582 ,595, 606, 618, 634–35; *Bruen*, 142 S. Ct. at 2130. So just as there is no public interest in enforcing statutes that violate the First Amendment, there is no public interest in enforcing statutes violating the Second, and the balance of harms favors Plaintiffs.

V.    **The court should advance the trial on the merits and consolidate it with the preliminary injunction, or, in the alternative, grant summary judgment to Plaintiffs.**

In this case, none of the material facts can be reasonably disputed. The firearms at issue are in common use and so the Illinois Firearm Ban and Magazine Ban are unconstitutional, full stop. *See Ezell*, 651 F.3d at 697–98 ("Once standing is established, the plaintiff's personal situation becomes irrelevant. It is enough that we have only the statute itself and the statement of basis and purpose that accompanied its promulgation."); *see also Moore v. Madigan*, 702 F.3d 933, 942 (7th Cir. 2012) ("The constitutionality of the challenged statutory provisions does not present factual

questions for determination in a trial."). Because the issues in this case are purely legal, there is no reason to delay and final judgment should be entered in Plaintiffs' favor. *See Socialist Workers Party v. Ill. State Bd. of Elections*, 566 F.2d 586, 587 (1977), *aff'd*, 440 U.S. 173 (1979).

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request the Court to grant them a preliminary injunction enjoining each Defendant, each Defendant's respective employees, officers, agents, and representatives, and all those acting in concert or participation with him or her, from enforcing the Illinois ban on semiautomatic firearms and standard capacity magazines, consisting of 720 ILL. COMP. STAT. 5/24-1.9(b) & (c); 5/24-1.10(b) & (c) and all related regulations, policies, and/or customs designed to enforce or implement the same. In the alternative, Plaintiffs request judgment in their favor as sought in their Complaint.

Dated: January 25, 2023                                  Respectfully Submitted,

                                                              /s/ David G. Sigale
                                                              Attorney for Plaintiffs

David G. Sigale (Atty. ID# 6238103)
LAW FIRM OF DAVID G. SIGALE, P.C.
430 West Roosevelt Road
Wheaton, IL 60187
630.452.4547
dsigale@sigalelaw.com

Attorney for Plaintiffs